UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

CIVIL ACTION NO. 7:18-cv-144

| | | |
|---|---|---|
| Erika R. Burns, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT for Sex Discrimination, |
| Vs. | ) | Retaliation, Hostile Work |
| | ) | Environment, Wrongful Discharge |
| | ) | and Negligent Supervision |
| Capitol Broadcasting Company, | ) | |
| Incorporated and Sunrise | ) | |
| Broadcasting, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

NOW COMES Plaintiff, complaining of Defendants, and alleges and says as follows:

## INTRODUCTION

1.     This is an action brought to remedy discrimination against Plaintiff in the terms, conditions, and privileges of employment, and to recover damages suffered by Plaintiff as a result of harassment and disparate treatment at work because of her gender.

2.     Plaintiff's Complaint is brought under Title VII of the Civil Rights Act of 1964 (Title VII) as amended by the Civil Rights Act of 1991 set forth in 42 U.S.C § 2000e *et seq.* and 42 U.S.C. § 1981A(b).

3.     This is also an action based upon retaliation against Plaintiff in violation of 42 U.S.C. § 2000e-3(a) because of her opposition to employment practices made unlawful by Title VLL of the Civil Rights Act of 1964.

4.     This action includes pendent North Carolina state law claims for wrongful discharge, intentional infliction of emotional distress, and negligent supervision and retention.

5.     Plaintiff seeks monetary relief, compensatory damages, and punitive damages pursuant to 42 U.S.C. § 2000e(g), 42 U.S.C. § 1981A(b), and North Carolina law.

## JURISDICTION AND VENUE

6.     Plaintiff resides in the Eastern District of North Carolina.

7.     On 7 July 2017, Plaintiff timely filed Charges of Sex Discrimination and Retaliation with the Equal Employment Opportunity Commission (EEOC), designated as EEOC Charge 433-2017-02579.

8.     On 28 February 2018, the EEOC issued a Notice of Right to Sue to Plaintiff.

9.     On 25 May 2018, the parties entered into a Status Quo & Tolling Agreement, which gave Plaintiff until 2 July 2018 to file a civil action against Defendants for any and all claims of or relating to Plaintiff's EEOC claim.

10.     On 19 June 2018, the parties entered into a Status Quo & Tolling Agreement (First Extension by Agreement of the Parties), which gave Plaintiff until

8 August 2018 to file a civil action against Defendants for any and all claims of or relating to Plaintiff's EEOC claim.

11.    Plaintiff has exhausted all her administrative remedies.

12.    Jurisdiction of the court is proper under § 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3).

13.    The unlawful employment practices complained of herein occurred within New Hanover County, North Carolina, and venue properly lies in the Eastern District of North Carolina pursuant to § 706 of Title VII, 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

14.    At all times relevant to this Complaint, Plaintiff worked for, and was employed by, Defendants.

15.    Defendant Sunrise Broadcasting, LLC is a North Carolina limited liability company licensed and doing business in the State of North Carolina with its registered office located at 2619 Western Boulevard, Raleigh, Wake County, North Carolina 27606.

16.    Defendant Capitol Broadcasting Company, Incorporated is a North Carolina corporation licensed and doing business in the State of North Carolina with its registered office located at 2619 Western Boulevard, Raleigh, Wake County, North Carolina 27606.

17.    Defendant Capitol Broadcasting Company, Incorporated wholly owns Sunrise Broadcasting, LLC.

18.     Defendant Sunrise Broadcasting, LLC is a broadcasting company consisting of five (5) radio stations in eastern North Carolina, with all stations located in Wilmington, New Hanover County, North Carolina.

19.     Defendant Sunrise Broadcasting, LLC is wholly owned by Capitol Broadcasting Company, Incorporated, a radio, television, digital media, satellite and data, and sports broadcasting company with offices in Raleigh-Durham, North Carolina, Rocky Mount, North Carolina, and Wilmington, North Carolina.

20.     Upon information and belief, at all times relevant to this Complaint, Defendant Capitol Broadcasting Company, Incorporated employed 501 or more employees for each working day in each of the 20 or more calendar weeks in the current or preceding calendar year.

21.     Upon information and belief, at all times relevant to this Complaint, Defendant Sunrise Broadcasting, LLC employed 15 or more employees for each working day in each of the 20 or more calendar weeks in the current or preceding calendar year.

22.     At all times relevant to this Complaint, Defendant Sunrise Broadcasting, LLC and/or Defendants Capitol Broadcasting Company, Incorporated employed the following people, all of whom acted as agents of Defendants and within the course and scope of their employment with respect to the acts complained of in the Complaint:

    a.  Josh Lee;

    b.  Brian Schimmel;

c.  Lexi Green;

d.  Kristine (Altman) Smith;

e.  Holly Shaw;

f.  Veronica Banning;

g.  Angie Emerline;

h.  Daniel Smith;

i.  Jimmy Goodmon, Sr.;

j.  Jimmy Goodmon, Jr.;

k.  Steve Coffin;

l.  Ross Mahoney;

m. Laura Chinni;

n.  Lauren LaMothe;

o.  Beverly Moore;

p.  Mary Davis;

q.  Candace (Reece) Lea;

r.  Kasey Stewart;

s.  Debbie Fitzgibbon;

t.  Connie Knox;

u.  Gina Bell;

v.  Jason "Foz" Fosdick;

w. Tina Crew;

x.  Mike Edwards;

y. Hannah Byrom;

z. Beth Cerrow;

aa. Artie Green;

bb. Jennifer McLean;

cc. David Patella;

dd. Terry Talbott;

ee. Tommy Gunn;

ff. Joel White; and

gg. Christine Martinez.

## STATEMENT OF FACTS

23.     Plaintiff is a 33-year-old female.

24.     Plaintiff has a bachelor's degree from the University of North Carolina at Wilmington, which she received in May 2008.

25.     Plaintiff began her employment with Next Media on 18 June 2007, when Plaintiff was hired as a sales representative.

26.     Next Media was sold to Jimmy Goodmon in November 2008 and became Sunrise Broadcasting, LLC, a division of Capitol Broadcasting Company, Incorporated.

27.     Plaintiff was employed by Defendants from November 2008 until 28 April 2017, when she was wrongfully terminated by Defendants.

28. During her employment with Defendants, Plaintiff met Joel White, another salesperson, and began a relationship with him. They would eventually marry in October 2013.

29. When Plaintiff was hired, there was a sales manager in place named Beth Cerrow.

30. Beth Cerrow was only in place for a few months before she resigned, and the position remained vacant for some time thereafter.

31. General Manager Artie Green also left Defendants' employ shortly after Plaintiff was hired.

32. After Beth Cerrow and Artie Green left Defendants' employ, Josh Lee, who was the senior salesperson at the time, was promoted to the role of Sales Manager.

33. Josh Lee held the role of Sales Manager from 2007 to 2009.

34. When Plaintiff first started working for Defendants she went to introduce herself to Josh Lee and he responded that "he didn't care to know [Plaintiff's] name" and that "most people quit after the first few months."

35. During his time as Sales Manager, Josh Lee and Plaintiff would develop a friendly working relationship and even became friends outside of work.

36. Plaintiff and Joel White would eventually become good friends with Josh Lee and his wife, Shannon.

37. During Josh Lee's time as Sales Manager he told salesperson Kristine Smith that if she wanted more money out of a certain client to go "suck his dick."

38.     Upon information and belief, Josh Lee's comments were reported to Defendants, but no disciplinary action was taken against Josh Lee.

39.     During Josh Lee's time as Sales Manager he told salesperson Candace (Reece) Lea to wear short skirts in order to get meetings with potential clients.

40.     Upon information and belief, Josh Lee's comments were reported to Defendants, but no disciplinary action was taken against Josh Lee.

41.     Josh Lee would eventually step down from the role of Sales Manager and return to his former position as senior salesperson.

42.     Once Josh Lee stepped down as Sales Manager, Jennifer McLean stepped into the role of Sales Manager.

43.     A new General Manager was also hired named David Patella.

44.     During her time as Sales Manager, Jennifer McLean and Plaintiff had several issues in the workplace, including, Jennifer McLean not providing Plaintiff with budgets, which were necessary as Plaintiff is a 100% commissioned salesperson.

45.     Plaintiff eventually contacted Angie Emerline with Human Resources in Raleigh about her issues with Jennifer McLean and asked if it was okay for Plaintiff to apply for other jobs in the company.

46.     Angie Emerline confirmed with Plaintiff that she was able to apply for other jobs within the company, so Plaintiff applied for an open position at TV station, CBS 10 WILM.

47.     Plaintiff interviewed with Sales Manager Terry Talbott and General Manager Connie Knox at 10 CBS WILM.

48. Terry Talbott wanted to hire Plaintiff immediately, however, Connie Knox told Terry Talbott that she didn't want to ruffle any feathers at Sunrise Broadcasting and thus, Plaintiff remained at Sunrise Broadcasting for the next eight (8) years.

49. During Jennifer McLean's time as Sales Manager, she encouraged inappropriate behavior by other salespeople towards Plaintiff, mostly stemming from Plaintiff's relationship with her co-worker Joel White.

50. During Jennifer McLean's time as Sales Manager, fellow salesperson Kristine (Altman) Smith would use Facebook to write inappropriate things about Plaintiff that other radio station employees and clients could see.

51. These comments from Kristine (Altman) Smith included how "fake" Plaintiff's blonde hair was, that she wished she could "scissor kick [Plaintiff] to the moon", and how she "needed a penicillin shot" to be around Plaintiff.

52. After hearing about these comments from other radio station employees, Plaintiff went online, printed them out, and forwarded them to local Human Resources Manager Mary Davis.

53. Mary Davis informed Plaintiff that she forwarded the information to Angie Emerline.

54. Kristine (Altman) Smith was never fired for her actions, and to Plaintiff's knowledge, nothing was ever done about the comments she made.

55. After several more issues with Jennifer McLean, including Jennifer McLean encouraging inappropriate behavior by other employees towards Plaintiff,

Plaintiff went back to Angie Emerline with Human Resources, and Jennifer McLean was eventually fired.

56. General Manager David Patella was eventually fired as well.

57. Brian Schimmel was eventually hired to become the new General Manager.

58. On 21 September 2013, Human Resources Manager Mary Davis decided to throw Plaintiff a bridal shower at Josh Lee's house, which many of the female employees at the radio station attended.

59. Once the shower ended, Plaintiff stayed behind to help Josh Lee's wife Shannon do the dishes and clean up from the event.

60. Josh Lee eventually returned to his house after the shower along with his two young sons, and Shannon left to go to a nearby gas station.

61. When Shannon left the house, Josh Lee came up behind Plaintiff while she was doing the dishes, pulled her into a nearby laundry room, pushed her up against the closet door, and touched her buttocks and breasts while kissing her on the neck.

62. Plaintiff informed Josh Lee that she was very uncomfortable with what he was doing, and opened the closet door and left the room.

63. Plaintiff did not tell Shannon what happened when Shannon returned because she did not want to upset her.

64.     Beginning in 2012 and continuing until 2016, on numerous occasions, Josh Lee would email or otherwise communicate with Plaintiff at work asking to see her in his office at the radio station.

65.     Plaintiff would go to Josh Lee's office anticipating a conversation about clients or another work-related issue, but instead Josh Lee would ask Plaintiff to expose her breasts or open her legs if Plaintiff had on a skirt so he could see her panties.  Josh Lee would also ask Plaintiff to step over near his desk so that he could brush his hand along her buttocks.

66.     On 28 January 2014, it snowed in Wilmington and the station closed early that day, and Plaintiff came home to find Josh Lee's car in her driveway.

67.     Josh Lee informed Plaintiff that he asked Joel White if he could come over because his house had no power and Plaintiff's house did.

68.     Plaintiff's husband Joel White was not home during this time, so Plaintiff made lunch and talked with Josh Lee while she waited for Joel White to return home.

69.     Joel White eventually called Plaintiff and told her that he was running errands after work and was on his way home.

70.     Plaintiff informed Josh Lee that Joel White was on his way home, and at that point, Josh Lee pulled Plaintiff into her bedroom located near the front of the house and told Plaintiff to perform oral sex on him.

71.     Josh Lee unzipped his pants and pushed Plaintiff towards the carpet.

72.     Plaintiff performed oral sex on Josh Lee, fearing that it would ruin things at work and so many relationships that she had in her life if she refused him.

73.     On numerous occasions at work, Josh Lee would walk up to Plaintiff's desk when she refused to come see him in his office.

74.     Josh Lee would take Plaintiff's phone off of her desk and begin looking through her photos.

75.     Plaintiff would have to go into Josh Lee's office to retrieve her phone.

76.     Josh Lee would ask Plaintiff to go home and take racy photos of herself.

77.     In order to avoid doing this, Plaintiff would offer to show Josh Lee pictures of some women that Plaintiff was friends with on Facebook and Instagram in bathing suits and the like.

78.     Josh Lee often told Plaintiff he could not get his wife Shannon to have sex with him or perform oral sex on him anymore.

79.     At one point, Josh Lee even took Plaintiff's phone off of her desk and into the men's room.

80.     At one time, Josh Lee forced Plaintiff to send him a picture that she had taken for her husband where Plaintiff was in a bra and panties.

81.     Josh Lee stated that he would never share it with anyone but he "wasn't getting any sex at home and needed something to get off to."

82.     Plaintiff informed Josh Lee that she did not want to share the photo with him, but Josh Lee had seen it on Plaintiff's phone after removing it from her desk.

83.     Josh Lee stood in front of Plaintiff while he forced Plaintiff to type out a message referring to Josh Lee as "J" in case someone ever came across the text message so that they would think Plaintiff accidentally sent the photo to Josh, meaning to send it to her husband, Joel.

84.     Joel White and Plaintiff eventually separated on 11 September 2015 and were divorced on 17 March 2017.

85.     Throughout Plaintiff's employment with Defendants, Josh Lee was given opportunities that the female salespeople were not given.

86.     Josh Lee became the sole male salesperson after Joel White quit working for Defendants a few months after his marriage to Plaintiff.

87.     Josh Lee was able to sell digital advertising and make additional revenue for over two (2) years before Defendants opened up that option to the female salespeople.

88.     Josh Lee was also given the ability to sell CBS 10 WILM, since it was their sister station.

89.     This favoritism towards Josh Lee infuriated the other female salespeople as well as the female TV station employees, who did not understand why Josh Lee was the only one allowed to sell TV advertising.

90.     A Production Director at the TV station named Danielle Bauman often had conflict with Josh Lee, as Josh Lee constantly talked down to her and he threated to call Jimmy Goodmon if she did not do what he asked.

91.     Plaintiff went to General Manager Brian Schimmel many times demanding that the female salespeople be allowed to sell TV advertising like Josh Lee.

92.     The female salespeople still were not allowed to sell TV advertising.

93.     Brian Schimmel did inform Plaintiff and the other female salespeople that Josh Lee would not be allowed to call on their radio clients.

94.     However, one of the first clients Josh Lee acquired was Parkway Hyundai, Subaru, and Volvo, Plaintiff's biggest car dealership advertising client.

95.     Parkway shifted all their money out of radio (Plaintiff's sales) and put all their money into TV (Josh Lee's sales).

96.     Plaintiff approached Brian Schimmel about this poaching of Plaintiff's client by Josh Lee and nothing was ever done.

97.     From December 2014 through July 2015, General Manager Steve Coffin (who has since been terminated) hired a sales assistant named Daniel Smith that was assigned specifically to Josh Lee.

98.     No sales assistants were hired for any of the female salespeople.

99.     All female salespeople and even clients, were upset by this favoritism of Josh Lee.

100.    Daniel Smith is a Caucasian male who was new to the broadcasting industry.

101.    Daniel Smith experienced intense hazing and harassment form both Josh Lee and Steve Coffin.

102.    Daniel Smith was harassed by Josh Lee almost daily.

103.    Josh Lee kept a "Stupid Jar" on his desk and made Daniel Smith put his own money into it anytime Daniel Smith did something that Josh Lee thought was stupid.

104.    Josh Lee often referred to Daniel Smith as "dumber than a bag of rocks," "too stupid to be married with a daughter," and even questioned "how he could have attended UNC and be so dumb."

105.    Several employees, including Ross Mahoney, Laura Chinni, and Lauren LaMothe, reported this harassment to Angie Emerline during a class called "Crucial Conversation."

106.    Daniel Smith would later inform Plaintiff that he went to the local Human Resources manager several times but nothing was done and that he had recorded proof of his harassment.

107.    On 23 February 2016, Plaintiff contacted Angie Emerline via email to let her know that when she came back to work from vacation, Brian Schimmel had given away Plaintiff's accounts without her knowledge.

108.    Plaintiff was only informed by Brian Schimmel that he had transferred one (1) of Plaintiff's accounts.

109.    Brian Schimmel and Mary Davis had a meeting with Plaintiff where Plaintiff told Brian Schimmel that his poor communication had led Plaintiff to believe that she was not valued or wanted at Sunrise Broadcasting.

110.   Brian Schimmel, Mary Davis, and Plaintiff set out a plan in that meeting in order to address Plaintiff's concerns.

111.   During early 2017, the Sunrise Broadcasting building was being renovated, so employees were located in the 10 CBS WILM building.

112.   On 28 March 2017, Josh Lee was angry about a sales program called "Bid on Wilmington."

113.   Josh Lee thought that a boat he had tied into the program had sold for too little money.

114.   Josh Lee confronted General Manager Brian Schimmel and Promotion Manager Lexi Green about this.

115.   After this conversation, Lexi Green left work crying and did not return for the rest of the day.

116.   Josh Lee threatened to quit and stormed out of the office, slamming the door.

117.   Josh Lee told his client and others that Brian Schimmel promised to compensate him with money for his mistake.

118.   Josh Lee said that Brian Schimmel was so scared he was going to lose Josh Lee since he threatened to quit that Josh Lee could have gotten Brian Schimmel to "suck his dick."

119.   Several of the female salespeople heard this comment from Josh Lee and did not say anything.

120. On 14 April 2017, Brian Schimmel told Plaintiff during their weekly meeting that Josh Lee had acquired another one of Plaintiff's accounts and that Josh was too busy to handle all of his accounts accurately.

121. Brian Schimmel then informed Plaintiff that she would begin working for Josh Lee.

122. Plaintiff asked Brian Schimmel if she had a choice and Brian Schimmel informed her that it was being asked not only of her but also of Kristine Smith, Holly Shaw, and Veronica Banning, three of the other female salespeople.

123. Brian Schimmel told Plaintiff that Josh Lee made a commitment to his family not to spend so much time at work, but that he did not want to give up any of his accounts.

124. Brian Schimmel informed Plaintiff that she and the other female salespeople would need to write scripts for Josh Lee, put his proposals together, and attend his client meetings.

125. Plaintiff inquired as to compensation as she was a 100% commissioned employee and had her own goals that she was accountable for.

126. Brian Schimmel responded that he and Josh Lee would figure something out at a later time, but for now just to do what Josh Lee asked her to.

127. Plaintiff was extremely uncomfortable with this arrangement, but was fearful that she would lose her job if she did not comply.

128. On 18 April 2017, after speaking with her boyfriend and family, Plaintiff contacted Angie Emerline via email.

129.     Plaintiff emailed Angie Emerline and informed her that Brian Schimmel told her that she would be working for Josh Lee.

130.     Plaintiff also listed her radio accounts that Josh Lee had acquired, without anything being given to Plaintiff as compensation.

131.     Plaintiff informed Angie Emerline that both Plaintiff and another female salesperson, Holly Shaw, had emailed Brian Schimmel about business matters affecting the entire sales team and Brian Schimmel would not respond.

132.     Plaintiff informed Angie Emerline that Josh Lee would email Brian Schimmel about a sales issue and Brian Schimmel would immediately respond with statements like "he's sorry for the inconvenience" or "he is working on it."

133.     Plaintiff informed Angie Emerline that Josh Lee would make comments to the female salespeople that he "feels sorry" for them and that he knows that Brian Schimmel shows favoritism towards him.

134.     Plaintiff informed Angie Emerline that Brian Schimmel would openly ask Josh Lee's opinion on matters pertaining to sales in front of the entire sales team but would not ask the female salespeople for their opinions.

135.     Plaintiff also detailed to Angie Emerline via email the comments Josh Lee had made about how he could get Brian Schimmel to do sexual favors for him (he could have gotten Brian Schimmel to "suck his dick") to the group of female salespeople on 28 March 2017.

136. Plaintiff informed Angie Emerline that she was not comfortable working for Josh Lee, but that she thought her job would be threatened if she told Brian Schimmel.

137. On 19 April 2017, after not receiving a response from Angie Emerline, Plaintiff followed up with another email.

138. In this email Plaintiff told Angie Emerline that she could not hold back anymore regarding her concerns about Josh Lee and his words and actions in the office towards her and the other female salespeople.

139. Plaintiff stated in the email that she and many of her co-workers feared speaking up about Josh Lee because Josh Lee and CEO Jimmy Goodmon's son had done "unsavory things" together, including illegal substance use in college as well as the fact that Josh Lee and Jimmy Goodmon, Jr. were friends and talked frequently on the phone and took hunting trips together.

140. Plaintiff also stated in the email the harassment that Daniel Smith had been subjected to by Josh Lee.

141. Plaintiff also mentioned the firing of Sales Manager Steve Coffin on 7 August 2015 for using the word "nigger" in front of Daniel Smith.

142. Plaintiff informed Angie Emerline that Josh Lee was scared after Steve Coffin was fired because Steve Coffin had informed him that Daniel Smith had recorded conversations on his phone.

143. Plaintiff begged Angie Emerline to investigate the ongoing harassment issues in the office involving Josh Lee.

144. On 19 April 2017, Angie Emerline responded to Plaintiff's email that she had been busy but would call Plaintiff by 21 April 2017.

145. On 21 April 2017, after not hearing from Angie at 4:00 pm, Plaintiff called Angie Emmeline and asked when she could expect to hear back from her.

146. Plaintiff did not feel comfortable speaking at her desk and tried to call Angie Emerline back from her cell phone but Angie Emerline did not answer, so Plaintiff left a voicemail requesting Angie Emerline return her call.

147. Angie Emerline did not return Plaintiff's call until 24 April 2017.

148. Angie Emerline and Plaintiff spoke briefly and Angie Emerline promised that she would look into things.

149. Four days later on 28 April 2017, Plaintiff was fired.

150. At 10:00 am on 28 April 2017, Plaintiff was working when Angie Emerline walked into the building.

151. Plaintiff waved at Angie Emerline and continued about her work day.

152. Approximately one hour later, Plaintiff was approached by Brian Schimmel and asked to come into his office, where Angie Emerline was seated.

153. Angie Emerline then informed Plaintiff this would be Plaintiff's last day working for Sunrise Broadcasting.

154. Angie Emerline stated she had investigated the issue and the Plaintiff "had it in" for Josh Lee.

155. Angie Emerline stated that she found no truth in Plaintiff's statements about Josh Lee, so she was firing Plaintiff.

156. Plaintiff was dumbfounded and asked for an explanation.

157. At that time, Plaintiff was handed a sheet of paper and Angie Emerline stated that the reason Plaintiff was being fired was on the sheet.

158. The sheet of paper stated Plaintiff was being fired because she allegedly lied to Defendants in her complaints to Angie Emerline, which was not true.

159. Plaintiff stated she did not lie about anything and did not understand why she was being fired.

160. Angie Emerline stated that she found Plaintiff's claim to be false and considered it to be harassment towards Josh Lee.

161. Angie Emerline also said that during her investigation, she heard that Plaintiff had said previously that Jason "Foz" Fosdick, a DJ for station 107.5 could not pass a drug test.

162. Angie Emerline stated that was against the Capitol Broadcasting Company, Incorporated's Code of Ethics to make disparaging comments about fellow employees.

163. Plaintiff responded that she never reported Jason "Foz" Fosdick's drug use to human resources or management, but that Jason "Foz" Fosdick made it common knowledge to Sunrise Broadcasting employees and management that he smoked marijuana.

164. Jason "Foz" Fosdick often bragged about smoking marijuana and told Brian Schimmel in front of Plaintiff and Kristine Smith to never drug test the employees because he would lose half of his staff, including himself.

165. Jason "Foz" Fosdick also stated that he would drive the radio station's "Z" van home to eat lunch and smoke marijuana.

166. Plaintiff told Angie Emerline to ask Ross Mahoney (a D.J. at the radio station) about the time Jason "Foz" Fosdick threw a bag of cocaine on Ross Mahoney's desk and told him he needed to do cocaine to be "edgier."

167. Brian Schimmel stated that what Ross Mahoney says does not matter because he had left to work at another radio station.

168. Plaintiff was given a box to pack up her desk.

169. Prior to her wrongful termination, Plaintiff had worked for Sunrise Broadcasting for ten (10) years, being salesperson of the year two (2) times and having a career high in sales in 2016.

170. Plaintiff was never written up on any performance plan or otherwise disciplined by Defendants prior to being terminated.

171. Plaintiff's sales increased by ten percent (10%) per year and was a great performer and loyal to the company.

172. Plaintiff was wrongfully terminated by Defendants when she reported the sex discrimination, sexual harassment, and disparate treatment by Josh Lee and Brian Schimmel that had been pervasive throughout her employment.

173. Plaintiff was told the reason for her termination was for a violation of the Code of Ethics, even though Josh Lee and Brian Schimmel had clearly, on numerous occasions, violated the Code of Ethics to extreme degrees and were not terminated.

174. The Code of Ethics states that employees "treat everyone with respect and dignity, regardless of job status."

175. Josh Lee had clearly violated the Code of Ethics repeatedly with his harassment of his sales assistant Daniel Smith, his sexual advances towards Plaintiff both in and out of the workplace, his sexually explicit comments in front of female employees, and his suggestions that female salespeople use their sexuality to acquire clients, among many other violations.

176. Brian Schimmel clearly violated the Code of Ethics and the law repeatedly with his favoritism of Josh Lee over Plaintiff and the other female salespeople.

177. At all times relevant to this Complaint, female salespeople were consistently not given the same opportunities as male salespeople and were subjected to the treatment to which Plaintiff has complained of herein.

178. At all times relevant to this Complaint, Plaintiff remained committed to working for Defendants and performing her job properly and efficiently, until, she was wrongfully terminated for reporting the sex discrimination and sexual harassment to human resources.

179. The reasons given for Plaintiff's termination were pretextual, false, and not based on any credible evidence.

## FIRST CAUSE OF ACTION:

## SEX DISCRIMINATION AND SEXUAL HARRASSMENT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND 1991

180. Plaintiff hereby incorporates the allegations of paragraphs one through 179 as if fully set forth herein.

181. The actions of Defendants, as set forth herein, constitute harassment and discrimination against Plaintiff on the basis of her gender.

182. Defendants failed to provide the same job opportunities, pay, and opportunities for advancement for the female salespeople as they did for the male salespeople.

183. Defendants also allowed Josh Lee to create a hostile work environment against Plaintiff and other female employees who worked around Josh Lee.

184. Josh Lee's sexual harassment of Plaintiff was severe and pervasive.

185. Josh Lee's sexual harassment of Plaintiff had the effect of unreasonably interfering with Plaintiff's work performance.

186. Josh Lee's conduct constituted a continuing violation of Plaintiff's right to be free from a work environment hostile to women.

187. Plaintiff was denied a safe workplace, free from sexual harassment, in violation of applicable federal law.

188. Defendants were on notice of Josh Lee's illegal discriminatory conduct because of his former management position, as well as his close relationship with Defendants' managers, as well as his close relationship with Jimmy Goodmon.

189. Moreover, top level managers and/or officers of Defendants either knew, or reasonably should have known of Josh Lee's propensity to engage in acts of sexual harassment, and specifically of his sexual harassment of Plaintiff.

190. Defendants failed to stop Josh Lee's sexual harassment of Plaintiff or to discipline Josh Lee for his illegal conduct.

191. Defendants had a completely ineffective sexual harassment policy.

192. Because of this ineffective policy, Josh Lee reasonably believed he would not be punished for his unwelcome sexual advances toward Plaintiff.

193. Because of this ineffective policy, Plaintiff reasonably believed nothing would be done to correct Josh Lee's conduct if she did complain.

194. The actions of Defendants as set forth herein, constitute harassment and intentional discrimination against Plaintiff on the basis of her sex, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A(a)(1).

195. Plaintiff is a member of the class these statutes are designed to protect.

196. Defendants engaged in discriminatory practices against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from sex discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

197. Plaintiff is entitled to all her benefits of employment, including but not limited to, back pay, front pay, health insurance, life insurance, and retirement benefits.

198. Plaintiff is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § *et seq.* (Title VII) in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct alleged herein.

199. Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a)(1) and (b)(1) in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

200. Plaintiff is further entitled to recover reasonable attorney's fees, the costs and the expenses of this action, and such interest as may be allowed by law.

## SECOND CAUSE OF ACTION:

## SEXUAL HARRASSMENT AND SEX DISCRIMINATION IN VIOLATION OF RECONSTRUCTION ERA STATUTES

201. Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs one through 179 as if fully set forth herein

202. The actions of Defendants as set forth herein constitute harassment and intentional discrimination on the basis of Plaintiff's sex, in violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981.

203. Plaintiff is a member of the class these statutes are designed to protect.

204. Plaintiff is entitled to all her lost benefits of employment, including but not limited to, back pay, front pay, health insurance, life insurance, and retirement benefits.

205. Plaintiff is entitled to compensatory damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct alleged herein.

206. Plaintiff is entitled to punitive damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

207. Plaintiff is further entitled to recover reasonable attorney's fees, the costs and expenses of this action and such interest as may be allowed by the law.

## THIRD CAUSE OF ACTION:

## RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964

208. Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs one through 207 as if fully set forth herein.

209. In conversations with employees of Defendants, Plaintiff asserted her right to be free from sexual harassment and sex discrimination, practices made unlawful under Title VII of the 1964 Civil Rights Act.

210. Plaintiff is a member of the class these statutes are designed to protect.

211. In charges of discrimination filed with the EEOC, Plaintiff asserted her right to be free from sexual harassment and sex discrimination, practices made unlawful under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a).

212. Defendants engaged in retaliation against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from sex discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

213. Plaintiff is entitled to all her lost benefits of employment, including but not limited to, back pay, front pay, health insurance, life insurance, and retirement benefits.

214. Plaintiff is entitled to compensatory damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct alleged herein.

215. Plaintiff is entitled to punitive damages as provided by the Reconstruction Era Statutes, 42 U.S.C. § 1981, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct alleged herein.

216. Plaintiff is further entitled to recover reasonable attorney's fees, the costs and expenses of this action and such interest as may be allowed by law.

## FOURTH CAUSE OF ACTION:

## HOSTILE WORK ENVIRONMENT

217. Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs one through 216 as if fully set forth herein.

218. The actions of Defendants as set forth herein, constitute harassment and intentional discrimination against Plaintiff on the basis of her sex, in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A(a)(1), and the Reconstruction Era Statutes, 42 U.S.C. § 1981.

219. Plaintiff is a member of the class these statutes are designed to protect.

220. A reasonable person would find Defendants' actions through its managers, officers, and employees as alleged herein to be hostile and abusive, and that said actions created a work environment that was hostile and abusive.

221. Plaintiff perceived Defendants' actions through its mangers, officers, and employees as alleged herein to be hostile and abusive, and said actions created a work environment that was hostile and abusive toward Plaintiff.

222. Defendants' actions through its mangers, officers, and employees as alleged herein were carried out because Plaintiff is female.

223. In fact, Defendants' actions through its mangers, officers, and employees created an atmosphere where Plaintiff was faced with harassment of such quality and quantity that a reasonable employee, including Plaintiff, would find the conditions of her employment altered for the worst.

224. Plaintiff did, in fact, find the conditions of her employment altered for the worst.

225. Defendants engaged in discriminatory practices against Plaintiff with either malice or with reckless indifference to the federally protected rights of Plaintiff to be free from sex discrimination in the workplace, as set forth in 42 U.S.C. § 1981A(b)(1).

226. Plaintiff is entitled to all her benefits of employment, including but not limited to, back pay, front pay, health insurance, life insurance, and retirement benefits.

227. Plaintiff is entitled to recover compensatory damages as provided by the 1964 Civil Rights Act, 42 U.S.C. § *et seq.* (Title VII) in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct alleged herein.

228. Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a)(1) and (b)(1) in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

229. Plaintiff is further entitled to recover reasonable attorney's fees, the costs and the expenses of this action, and such interest as may be allowed by law.

## FIFTH CAUSE OF ACTION:

## WRONGFUL DISCHARGE

230. Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs one through 229 as if fully set forth herein.

231. The adverse employment actions taken by Defendants, including the termination of Plaintiff from her position as salesperson, were in violation of the public policy of the State of North Carolina, specifically, the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1, *et seq.*, which makes discrimination on account of sex an unlawful practice in North Carolina.

232. Plaintiff was terminated from her position as salesperson as a result of reporting sex discrimination and sexual harassment that occurred during her employment with Defendants.

233. Plaintiff is entitled to recover from Defendants her compensatory damages as provided by North Carolina law, including but not limited to, reinstatement of her job, back pay, front pay, benefits of employment, emotional distress, loss of reputation, an inconvenience, all of which damages are in excess of $25,000.00, the exact amount to be proven at trial.

234. Defendants' conduct as described herein was willful, malicious, oppressive, wanton, and recklessly in disregard of Plaintiff's rights as to entitle Plaintiff to punitive damages in excess of $25,000.00, the exact amount to be proven at trial.

235. Managers, Officers, Directors and/or Employees of Defendants either participated in or condoned the willful, malicious, oppressive, wanton and reckless conduct, thereby justifying an award of punitive damages against the corporate Defendants, as set forth in N.C.G.S. § 1D-15.

236. Plaintiff is further entitled to the costs and expenses of this action and such interest as may be allowed by law.

## SIXTH CAUSE OF ACTION:

### NEGLIGENT SUPERVISION AND RETENTION

237. Plaintiff hereby re-alleges and incorporates by reference the allegations of paragraphs one through 236 as if fully set forth herein.

238. Defendants owed Plaintiff a duty of care to maintain a safe and secure work environment, free from sex discrimination, sexual harassment, misconduct, and intimidation.

239. Defendants, through its agents, owed Plaintiff a duty of care to restrain its employees from the continued discrimination of Plaintiff, to investigate the discrimination as it became known to management employees, and to take appropriate action in order to deter Josh Lee and General Manager Brian Schimmel from continuing their sexually biased misconduct.

240. Defendants were negligent in one or more of the following ways:

   a. By asking Plaintiff to work for Josh Lee when it knew or reasonably should have known that he would abuse his position of authority, make decisions about Plaintiff's employment based on her sex, make repeated sexual advances towards Plaintiff both in and out of the workplace, and retaliate against Plaintiff for her asserting her rights to be protected from sex discrimination in the workplace.

   b. By failing to adequately supervise General Manager Brian Schimmel and to stop his sex discrimination of Plaintiff and other female employees.

   c. By failing to implement and enforce an effective sex discrimination and sexual harassment policies.

   d. By failing to train supervisors and management employees that sex discrimination and sexual harassment would not be tolerated in the workplace.

   e. By failing to control and eliminate the atmosphere of sex discrimination and sexual harassment in Defendants' offices in New Hanover County, North Carolina, and instead tolerating an atmosphere that was hostile to females including Plaintiff.

   f. By failing to halt the demeaning, abusive behavior by Josh Lee and Brian Schimmel, but rather tolerating such behavior as acceptable.

g. By such other and further ways to be proven through discovery and/or at trial.

241. The negligence of Defendants proximately caused Plaintiff emotional distress and mental suffering.

242. Plaintiff is entitled to compensatory damages in an amount exceeding $25,000.00 as a proximate result of Defendants' negligence, the exact amount to be proven at trial.

243. Plaintiff has suffered lost wages, lost health insurance, life insurance, and retirement benefits as a result of Defendants' negligence.

244. Defendants' negligence was carried out with a reckless disregard for the rights of Plaintiff, thus justifying an award of punitive damages.

245. Managers, Officers, Directors and/or Employees of Defendants either participated in or condoned the conduct complained of herein, thereby justifying an award of punitive damages against the corporate Defendants, as set forth in N.C.G.S. § 1D-15.

246. Plaintiff is entitled to punitive damages from Defendants for negligent supervision and retention in an amount in excess of $25,000.00, the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury of all issues so triable and respectfully prays for judgment against Defendants as follows:

1.     A declaration that the acts and practices complained of herein are in violation of Title VII and the 1964 Civil Rights Act and the Reconstruction Era Statutes.

2.     An Order enjoining Defendants from engaging in discrimination on the basis of sex in accordance with N.C.G.S. § 143-422.1, Title VII of the 1964 Civil Rights Act and the Reconstruction Era Statutes.

3.     For a money judgment against Defendants for the violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981A, representing all lost benefits of employment and compensatory damages, including but not limited to, loss of wages, loss of benefits, loss of status, loss of reputation, emotional distress and inconvenience, for an amount in excess of $25,000.00, which amount shall be determined specifically at the trial of this action.

4.     For a money judgment against Defendants representing punitive damages under § 1977A of the Civil Rights Act of 1991, 42 U.S.C. § 1981A, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

5.     For a money judgment against Defendants for the violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981 representing all benefits of employment and compensatory damages, including but not limited to, loss of wages, loss of benefits, emotional distress, loss of status, loss of reputation, and inconvenience, for an amount in excess of $25,000.00, which amount shall be determined specifically at the trial of this action.

Case 7:18-cv-00144-FL    Document 1    Filed 08/08/18    Page 34 of 37

6. For a money judgment against Defendants representing punitive damages for a violation of the Reconstruction Era Statutes, 42 U.S.C. § 1981, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

7. For a money judgment against Defendants for wrongful discharge in violation of the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1, *et seq.*, representing all lost benefits of employment and compensatory damages, including but not limited to, lost wages, lost employment benefits, loss of status, loss of reputation, and inconvenience, for an amount in excess of $25,000.00, which amount shall be determined specifically at a trial of this action.

8. For a money judgment against Defendants for punitive damages for wrongful discharge because of malicious, willful, and wanton violation of the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1, *et seq.*, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

9. For a money judgment against Defendants for punitive damages for intentional infliction of emotional distress, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

10. For a money judgment against Defendants for compensatory damages for negligent supervision and retention, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

11.    For a money judgment against Defendants for punitive damages for negligent supervision and retention, for an amount exceeding $25,000.00, which amount shall be determined specifically at the trial of this action.

12.    For a money judgement representing pre-judgment interest.

13.    For the Court to retain jurisdiction over this action until Defendants have fully complied with the orders of the Court and that the Court further require Defendants to file such reports as may be necessary to supervise such compliance.

14.    For the costs of suit, including an award of reasonable attorney's fees pursuant to federal law.

15.    For such other and further relief as the may be just, proper, and necessary to afford complete relief to Plaintiff and to provide Plaintiff that to which she is entitled at the time this action is tried.

This the 8th day of August, 2018.

**THE LAW GROUP**

By:    /s/Michael P. Kepley

Michael Kepley
Bar No. 34039
Attorney for Plaintiff
611 Princess Street
Wilmington, North Carolina 28401
910-251-6088
910-401-1819 (fax)
Michael@LawGroupNC.com
LawGroup@LawGroupNC.com
www.LawGroupNC.com

By: /s/Shawn R. Evans

Shawn R. Evans
Bar No. 33910
Attorney for Plaintiff
611 Princess Street
Wilmington, North Carolina 28401
910-251-6088
910-401-1819 (fax)
Shawn@LawGroupNC.com
LawGroup@LawGroupNC.com
www.LawGroupNC.com


By: /s/Megan E. Schultz

Megan E. Schultz
Bar No. 51671
Attorney for Plaintiff
611 Princess Street
Wilmington, North Carolina 28401
910-251-6088
910-401-1819 (fax)
Megan@LawGroupNC.com
LawGroup@LawGroupNC.com
www.LawGroupNC.com